## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| **TANYA GIVENS,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | **Civil Action No.** |
| **v.** ) | **24-10355-BEM** |
| ) | |
| **MASSACHUSETTS INSTITUTE OF** ) | |
| **TECHNOLOGY,** ) | |
| ) | |
| **Defendant.** ) | |

## MEMORANDUM AND ORDER ON
## <u>DEFENDANT'S MOTION FOR SUMMARY JUDGMENT</u>

**MURPHY, J.**

Plaintiff Tanya Givens brings this action against Defendant Massachusetts Institute of Technology ("MIT") alleging race-based discrimination, hostile work environment, and retaliation in employment in violation of Mass. Gen. Laws c. 151B ("Chapter 151B") and Title VII of the Civil Rights Act of 1964 ("Title VII"), and violations of the Family Medical Leave Act ("FMLA"). Before the Court is MIT's motion for summary judgment. For the reasons set forth below, the Court GRANTS MIT's motion.

## I.    <u>Background</u>

As an initial matter, Ms. Givens purports to dispute certain paragraphs of MIT's statement of material facts. *See generally* Dkt. 37 ("CSMF"). However, the Court will disregard Ms. Givens's attempts to dispute facts where there is no citation to the record to demonstrate that such a dispute actually exists, or where the purported evidence does not actually create a genuine

dispute of fact.[1]  *See* Fed. R. Civ. P. 56(c)–(d); *O'Brien v. Town of Agawam*, 440 F. Supp. 2d 3, 5 n.1 (D. Mass. 2006) (recognizing that at the summary judgment stage, "[t]he court will disregard any . . . conclusory statements, as well as purported statements of 'fact' not properly supported by citations to the record"); *Aulisio v. Baystate Health Sys., Inc.*, 2012 WL 3957985, at *5 (D. Mass. Sept. 7, 2012) (recognizing that Local Rule 56.1 "requires concise statements of material facts, not arguments").  The fact that Ms. Givens disputes the meaning, sincerity, or effect of a statement does not create a dispute that the statement was made.  Nor does Ms. Givens's desire to add additional context create a genuine dispute.  As such, the Court treats as undisputed the facts in paragraphs 18–21, 30, 34, 51–53, 67, 71–73, 78,[2] 81, 84, 88, 90–108, portions of 109, 110–11, 114–16, 121–23, and 127–29 of the statement of facts, but will draw all reasonable inferences from the facts in Ms. Givens's favor, as it must at summary judgment, *see Noonan v. Staples, Inc.*, 556 F.3d 20, 25 (1st Cir. 2009).[3]

A.     **Factual Background**

MIT is a research university located in Cambridge, Massachusetts.  Dkt. 31 ("SMF") ¶ 1. MIT Health is a full ambulatory care center on the MIT campus serving the MIT community—including students, faculty, employees, and their families.  *Id.* ¶ 2.  In late 2012,

---

[1] For example, Ms. Givens confusingly "[d]ispute[s]" MIT's assertion that she was a "'very high producer of tactical transactional items' and a 'workhorse' in 'a very positive way'" by stating that she was "always seen as a very high producer and performer," citing to the same deposition testimony as did MIT.  *See* CSMF ¶ 19.

[2] After paragraph 74, there appears to be a numbering error in the counterstatement of material facts that results in the mistaken addition of a paragraph, such that the paragraphs starting at 76 are all numbered one higher than the corresponding paragraphs from the statement of material facts.  In other words, the paragraph numbered 75 in the statement of material facts appears as paragraph 76 in the counterstatement of material facts, and this pattern follows for the remaining paragraphs.  The Court uses the paragraph numbers as they appear in each document.

[3] As to at least one paragraph of the statement of facts, Ms. Givens does not properly dispute it in her counterstatement of material facts but does cite to other record evidence in her opposition that creates a genuine dispute of fact.  *Compare* CSMF ¶ 50, *with* Dkt. 35 ("Opp.") at 5.  The Court treats this paragraph as properly disputed for the purposes of summary judgment.

MIT Health hired Ms. Givens, who identifies as Black, as a temporary leased employee. *Id.* ¶¶ 3–4. In February 2013, MIT Health directly hired Ms. Givens to work in the Primary Care department as a Clinical Assistant I, which later became known as a Patient Service Representative ("PSR"). *Id.* ¶ 5. In this role, which she held from 2012 to 2019, Ms. Givens performed the tasks of a front desk receptionist, which included answering the phone, greeting patients, taking messages, maintaining and updating provider schedules, scheduling appointments, collecting and updating patient demographics, and collecting insurance payments. *Id.* ¶¶ 6–7.

In February 2019, Ms. Givens was promoted to the position of Lead PSR. *Id.* ¶ 9. In that position, Ms. Givens continued to perform receptionist tasks, and she took on additional duties, such as approving time sheets and vacation time, scheduling staff, and handling invoices. *Id.* ¶ 10.[4]

In or around July 2021, Ms. Givens applied for a position as Supervisor, Administrative Clinical Operations Department: Primary Care (the "Primary Care Supervisor"). *Id.* ¶ 16. During this time, Cathi Tetreault, the then-Director of Human Resources for MIT Health, counseled Ms. Givens about some issues with Ms. Givens's job performance, specifically that Ms. Givens had "gaps" in her diplomacy, her "ability to reach across the aisle and interface with others" and her ability to delegate—in other words, that she was considered difficult to work with. *Id.* ¶¶ 18–20. As part of this counseling, Ms. Tetrault said that she had concerns that Ms. Givens was "rough around the edges." *Id.* ¶ 22. The parties dispute whether this statement was made in comparison to white employees. CSMF ¶ 23. Despite this feedback, Ms. Givens was considered

---

[4] Around March 2021, Ms. Givens applied for a position as Supervisor, Administrative Referral Operations (the "Referral Operations Supervisor"). SMF ¶ 11. The job instead went to another candidate, who also identifies as Black. *Id.* ¶¶ 12–13. Ms. Givens concedes that she was not "passed over" for the position of Referral Operations Supervisor because of her race. *Id.* ¶ 15.

a "very high producer of tactical transactional items" and a "workhorse" in a "very positive way." SMF ¶ 19.

In September 2021, Ms. Givens was offered and accepted the Primary Care Supervisor position, which had a salary of $65,000—a 16.17% increase in her pay.[5]  *Id.* ¶¶ 24, 27.  In this supervisory role, Ms. Givens was in charge of "supervising the [PSRs] and the clinical operation of the front desk."  Dkt. 36-8 ("Giddarie Dep. Tr.") at 35:11–13.  She also continued to complete PSR tasks.  Dkt. 36-4 ("Givens Dep. Tr.") at 175:18–20 ("I was saying to [Ketline Edouard] ever since I have been a lead, I have been doing everyone's titles from supervisor to lead to PSR."); Dkt. 36-11 ("Tetreault Dep. Tr.") at 22:3–5 (testifying that, shortly after her 2021 promotion to a supervisory role, Ms. Givens still was "taking on the work and doing the work of a [PSR] rather than coaching her staff for them to do the work.").  In the spring of 2022, at least one employee reporting to Ms. Givens complained about Ms. Givens's leadership style and then quit because she felt that the "dynamic" with Ms. Givens was "worsening" and "prohibiting" her growth.  SMF ¶¶ 31–32.

On September 1, 2022, MIT Health promoted Jacqueline Nazoliny, who identifies as Black or African American,[6] from the position of Medical Specialties Supervisor to the position of Medical Specialties Manager.  *Id.* ¶¶ 34, 38.  Afterwards, Ms. Givens met separately with Regina Harvey—the Associate Director for Clinical Operations, Primary Care—and Maureen

---

[5] During Ms. Givens's first two years as Primary Care Supervisor, MIT increased her salary four times: to $66,950 on December 1, 2021; to $73,645 on April 1, 2022; to $76,333 on July 1, 2022; and to $78,623 on July 1, 2023.  SOF ¶ 29.

[6] While Ms. Givens disputes that Ms. Nazoliny is Black, CSMF ¶ 34, Ms. Givens's testimony that she does not believe Ms. Nazoliny is Black and the testimony of the Director of Clinical Operations that he does not know if Ms. Nazoliny is Black does not create a genuine dispute as to how Ms. Nazoliny *actually* identifies, which is supported by undisputed record evidence, Dkt. 32-9 at 2 (MIT employee profile for Ms. Nazoliny, in which she identifies herself as Black or African American).

Johnston—the Director of Clinical Operations—to discuss why Ms. Givens had not been promoted to a manager position at the same time as Ms. Nazoliny. *Id.* ¶¶ 43–44. Ms. Harvey and Ms. Johnston explained that this was due to Ms. Givens's lack of a formal college degree and comparatively limited managerial experience.[7] *Id.* ¶ 44. On October 21, 2022, Ms. Givens again met with Ms. Johnston to discuss her work performance, and Ms. Johnston reiterated the importance of additional experience and a formal college degree for Ms. Givens to be promoted to manager. *Id.* ¶¶ 46–51, 53. Ms. Johnston also suggested that Ms. Givens meet with Thanh Giddarie, MIT's Director for Human Resources, to "further [Ms. Givens's] growth." *Id.* ¶ 52. Ms. Givens and Ms. Johnston had a similar conversation again in February 2023.[8] *Id.* ¶¶ 55–57.

In February 2023, Ketline Edouard began in the role of Interim Associate Chief of Nursing, which had previously been Ms. Harvey's role. *Id.* ¶ 59. After observing Ms. Givens complete PSR tasks, on March 9, 2023, Ms. Edouard met with Ms. Givens to discuss making time for Ms. Givens to perform her supervisory tasks. *Id.* ¶¶ 63–64. Ms. Given emphasized that she needed to complete PSR tasks herself due to being short-staffed. *Id.* ¶ 64. In other March 2023 conversations, Ms. Edouard urged Ms. Givens to focus more on the tasks of an Administrative Supervisor and asked Ms. Givens to propose a schedule that divided her time between supervisory and PSR tasks to avoid muti-tasking. *Id.* ¶¶ 65–66. In response, Ms. Givens sent Ms. Edouard an email that outlined a schedule that divided her week in half, with two and a half days devoted to Administrative Supervisor tasks and two and a half days devoted to PSR tasks. *Id.* ¶ 67. In further

---

[7] The parties dispute whether Ms. Johnston called her "uneducated," demeaned her leadership style, or otherwise acted in a manner that "favored non-black employees." Opp. at 5; SMF ¶ 50; Dkt. 40 ("Reply") at 9. Ms. Givens also disputes the purpose for which these statements were made, characterizing them as "belittling." CSMF ¶¶ 50–53.

[8] Ms. Givens reported directly to Ms. Johnston from December 2022 until February 2023, when Ms. Harvey went on leave. SMF ¶ 58.

emails between the two, Ms. Edouard outlined a list of supervisory responsibilities, and Ms. Givens added her PSR tasks, stating that she "continue[d] to do all lead duties/PSR duties since accepting Supervising position (back up/short staff) [a]nd job description as a Supervisor." *Id.* ¶¶ 68–69.

Ms. Givens contends that, in early 2023, Jerry Ellis—who was then the Human Resources Manager—asked Ms. Givens if she had heard the saying about the "house n-word and the field n-word" (the "Alleged Remark"), and that Ms. Givens said "no."  SMF ¶ 124 (quoting Givens Dep. Tr. at 246:13–16).  Then, Mr. Ellis purportedly replied that Ms. Givens should "stay in the light." *Id.* (quoting Givens Dep. Tr. at 246:17).  When Ms. Givens asked, "What does that mean," Mr. Ellis allegedly responded, "Just keep doing your work.  Stay out of the fights." *Id.* (quoting Givens Dep. Tr. at 246:17–19).  Ms. Givens testified that she has "no idea" of the context of that inquiry from Mr. Ellis, *id.* (quoting Givens Dep. Tr. at 246:8–10), and that she did not understand what Mr. Ellis meant by these remarks, *id.* (quoting Givens Dep. Tr. at 246:20–22).

Afterwards, Ms. Givens discussed the Alleged Remark with two of her co-workers. *Id.* ¶¶ 125–26.  One told Ms. Givens that the Alleged Remark was inappropriate. *Id.* ¶ 125.  The other asked Ms. Givens if she had heard the phrase, and Ms. Givens responded that she had "never heard [the phrase] in [her] life." *Id.* ¶ 126 (quoting Givens Dep. Tr. at 249:13–14).  When asked if anyone had explained the phrase to her, Ms. Givens testified that her aunt explained that the phrase referred to slavery, "where the light skin people go in the house and then the dark are picking cotton." *Id.* ¶ 127 (quoting Givens Dep. Tr. at 249:19–22).

In July 2023, Ms. Givens went on FMLA leave. *Id.* ¶ 70.  During Ms. Givens's FMLA leave, MIT created and filled positions for "Manager of Administrative, Clinical Operations, Primary Care" ("Primary Care Manager") and a Manager of the Contact Center ("Contact Center

Manager"). *Id.* ¶¶ 71, 79. These positions were posted publicly,[9] but Ms. Givens did not apply for either of these positions. *Id.* ¶¶ 72, 81. No one at MIT instructed Ms. Givens not to apply for these positions.[10] *Id.* ¶ 73. Ms. Givens does not contend that MIT created the positions of Primary Care Manager or Contact Center Manager while she was on FMLA leave because of her race. *Id.* ¶ 80.

While Ms. Givens was still on FMLA leave, MIT hired Marilee Soto, who identifies as Hispanic/Latino, for the Primary Care Manager position. *Id.* ¶¶ 74, 77. At the time of her hiring, Ms. Soto had over a decade of prior managerial experience at two different hospitals and a master's degree. *Id.* ¶¶ 75–76. MIT hired Paola Held, who identifies as Hispanic/Latino, for the Contact Center Manager position. *Id.* ¶¶ 82, 85. At the time of her hiring, Ms. Held had approximately six years of experience as the manager of a call center for Cambridge Health Alliance. *Id.* ¶ 83. There is no dispute as to Ms. Held's qualifications for the position.[11] *Id.* ¶ 84.

When Ms. Givens returned from her FMLA leave in January 2024, she returned to the position of Primary Care Supervisor. *Id.* ¶ 109. There was no change to her job title, pay, or benefits. *Id.* ¶¶ 109–11. However, the parties dispute the extent to which Ms. Givens's job functions and responsibilities changed after her return. *Id.* ¶ 109; CSMF ¶¶ 71, 110. Ms. Givens argues that her job upon return was a demotion that stripped her of all supervisory tasks. CSMF

---

[9] Defense counsel confirmed this at the hearing. *See* Aug. 14, 2025 Rough Hr'g Tr. at 8:24–9:1.

[10] Ms. Givens contends that the timing of the posting was to prevent her from applying. Opp. at 9–11; *see also* CSMF ¶ 71. The Court need not credit this unsubstantiated speculation. *See Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) ("[A] court . . . disregards '[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation.'" (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010))); *see also Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000) ("[N]on-moving party [may not] 'rest[] merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990))). The fact that the positions were posted publicly provided Ms. Givens the ability to apply. *See infra* at 13–14.

[11] Ms. Givens disputes that Ms. Held is *more* qualified for the position but not that Ms. Held is at least also qualified for the position. Opp. at 12–15; *see also* CSMF ¶¶ 71, 85.

¶ 71.  She further contends that Ms. Soto's manger position "was identical to the position of Supervisor which Ms. Givens held prior to her leave."  *Id.*

On February 20, 2024, Ms. Givens's attorney sent a letter to MIT's attorney asserting that, since her return from FMLA, Ms. Givens "was subjected to conduct that evidences an active effort to constructively discharge her by making that continued performance of her duties intolerable and impossible" and that Ms. Givens "cannot return for further work at M.I.T."  SMF ¶ 112.  MIT's attorney responded to this letter the next day.  *See* Dkt. 41-2 at 2–3.  On or around this time, Ms. Givens resigned from her position.[12]

### B. Procedural Background

Ms. Givens filed this action on December 1, 2023, in Massachusetts Superior Court.  MIT removed the case to this Court on February 14, 2024.  On February 29, 2024, Ms. Givens filed an amended complaint, which asserted three counts against MIT: (1) race-based discrimination, hostile work environment, and retaliation in employment in violation of Chapter 151B; (2) race-based discrimination, hostile work environment, and retaliation in employment in violation of Title VII; and (3) violations of the FMLA.  MIT has now moved for summary judgment.  The Court heard oral arguments on August 14, 2025, and took the matter under advisement.

## II. Standard of Review

Summary judgment will only be granted where the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of

---

[12] Neither party provides the date of resignation, though it seems to have been around the date of the letter from Ms. Givens's counsel.

law." *Grogan v. All My Sons Bus. Dev. LLC*, 552 F. Supp. 3d 142, 145 (D. Mass. 2021) (quoting Fed. R. Civ. P. 56(a)). A fact is "material" if it "might affect the outcome of the suit under the governing law." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* The Court must view "the record in the light most favorable to the nonmovant, drawing reasonable inferences in his favor." *Noonan*, 556 F.3d at 25. However, "[a]s to issues on which the party opposing summary judgment would bear the burden of proof at trial, that party may not simply rely on the absence of evidence but, rather, must point to definite and competent evidence showing the existence of a genuine issue of material fact." *Perez v. Lorraine Enters.*, 769 F.3d 23, 29–30 (1st Cir. 2014).

"At summary judgment, the court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." *Noonan*, 556 F.3d at 25 (internal quotation marks omitted) (quoting *Asociación de Periodistas de P.R. v. Mueller*, 529 F.3d 52, 55 (1st Cir. 2008)). "[W]hen the facts support plausible but conflicting inferences on a pivotal issue in the case, the judge may not choose between those inferences at the summary judgment stage." *Coyne v. Taber Partners I*, 53 F.3d 454, 460 (1st Cir. 1995). As such, "[s]ummary judgment is not appropriate merely because the facts offered by the moving party seem most plausible, or because the opponent is unlikely to prevail at trial," regardless of any skepticism the Court may hold as to the merits of a case. *Hazard v. S. Union Co.*, 275 F. Supp. 2d 214, 222 (D.R.I. 2003); *see also United States v. New England Merchants Nat. Bank*, 465 F. Supp. 83, 85 n.1 (D. Mass. 1979) ("The plaintiffs have a right to a trial '. . . where there is the slightest doubt as to the facts.'" (quoting *Peckham v. Ronrico Co.*, 171 F.2d 653, 657 (1st Cir. 1948))).

Employment discrimination claims involve elusive concepts such as motive or intent, but summary judgment is appropriate "if the non-moving party 'rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.'" *Feliciano de la Cruz v. El Conquistador Resort & Country Club*, 218 F.3d 1, 5 (1st Cir. 2000) (quoting *Medina-Munoz v. R.J. Reynolds Tobacco Co.*, 896 F.2d 5, 8 (1st Cir. 1990)). Even so, a court "should exercise particular caution before granting summary judgment for employers on such issues as pretext, motive, and intent." *Adamson v. Walgreens Co.*, 750 F.3d 73, 83 (1st Cir. 2014).

## III.  Discussion

### A.  Chapter 151B and Title VII

#### 1.  Discrimination

Where, as here, Ms. Givens has not offered direct evidence[13] of unlawful discrimination, the *McDonnell Douglas* burden-shifting framework applies. *See McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802–04 (1973); *Straughn v. Delta Air Lines, Inc.*, 250 F.3d 23, 33 (1st Cir. 2001); *Knight v. Avon Prods., Inc.*, 438 Mass. 413, 420 (2003). "To establish a *prima facie* case of racial discrimination, [the plaintiff] must show that (1) [s]he belonged to a protected class, a racial minority; (2) [s]he was performing [her] job at a level that rules out the possibility that [s]he was fired for job performance; (3) [s]he suffered an adverse job action by [her] employer; and (4) [her] employer sought a replacement for [her] with roughly equivalent qualifications." *Benoit*

---

[13] Direct evidence "consists of statements by a decisionmaker that directly reflect the alleged animus and bear squarely on the contested employment decision." *Zampierollo-Rheinfeldt v. Ingersoll-Rand de P.R., Inc.*, 999 F.3d 37, 51 (1st Cir. 2021) (citations omitted). Ms. Givens has not offered direct evidence, and both parties agree that the *McDonnell Douglas* framework applies.

*v. Tech. Mfg. Corp.*, 331 F.3d 166, 173 (1st Cir. 2003) (citations omitted).[14]  "[T]he plaintiff's initial burden of establishing a prima facie case is not intended to be onerous." *Sullivan v. Liberty Mut. Ins. Co.*, 444 Mass. 34, 45 (2005).

Once a plaintiff establishes a *prima facie* case of racial discrimination, a defendant must articulate "a legitimate, non-discriminatory reason for its adverse employment action." *Benoit*, 331 F.3d at 174 (quoting *Straughn*, 250 F.3d at 33).  "[A] defendant 'need only produce enough competent evidence, *taken as true,* to enable a rational factfinder to conclude that there existed a nondiscriminatory reason for the challenged employment action.'" *Heard v. Massachusetts*, 2003 WL 21960726, at *3 (D. Mass. Aug. 11, 2003) (emphasis in original) (quoting *Ruiz v. Posadas de San Juan Assocs.*, 124 F.3d 243, 248 (1st Cir. 1997)).

When a defendant carries its burden of production to identify a non-discriminatory business reason for termination, the burden returns to the plaintiff to "proffer[] evidence to establish that defendant's non-discriminatory justification is mere pretext, cloaking discriminatory animus." *Id.* (citing *McDonnell Douglas*, 411 U.S. at 804); *see also Siupa v. Astra Tech, Inc.*, 2013 WL 4854031, at *10 (D. Mass. Sept. 10, 2013) ("Massachusetts law regarding pretext is more generous to plaintiffs, [but] still requires a showing that one or more of the employer's proffered reasons are false."[15] (citing *Lipchitz v. Raytheon Co.*, 434 Mass. 493, 501–02 (2001))), *aff'd sub nom. Ryan v. Astra Tech, Inc.*, 772 F.3d 50 (1st Cir. 2014).

---

[14] Massachusetts courts consider federal case law construing federal anti-discrimination statutes in interpreting Chapter 151B. *See Wheatley v. Am. Tel. & Tel. Co.*, 418 Mass. 394, 397 (1994).  However, per legislative directive, Chapter 151B "is to be applied liberally."  *See Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 536 (2001).  For the purposes of this motion, the Court determines that the results are the same under federal and state law and thus does not distinguish in its analysis.

[15] "Massachusetts is a pretext only jurisdiction, [so] a plaintiff proceeding under Chapter 151B need only show that the [employer's] facially proper reasons given for its action against [the plaintiff] were not the real reasons." *O'Horo v. Bos. Med. Ctr. Corp.*, 131 F.4th 1, 15 (1st Cir. 2025) (second and third alterations in original) (internal quotation marks omitted) (quoting *Diaz v. City of Somerville*, 59 F.4th 24, 29 (1st Cir. 2023)).  This distinction makes no difference in the outcome of this case.

Ms. Givens contends that MIT's failure to promote her to the position of either Primary Care Manager or Contact Center Manager constitutes unlawful racial discrimination.[16]  Dkt. 35 ("Opp.") at 8.  To make out a *prima facie* case of racial discrimination in the failure-to-promote context, a plaintiff "must show that (1) [s]he is a member of a protected class, (2) [s]he was qualified for the position to which [s]he applied, (3) [s]he was not hired, and (4) an applicant with similar qualifications received the position."  *Lopez-Hernandez v. Terumo P.R. LLC*, 64 F.4th 22, 28 (1st Cir. 2023) (alterations in original) (quoting *Henderson v. Mass. Bay Transp. Auth.*, 977 F.3d 20, 29 (1st Cir. 2020)).  To do so, a "plaintiff must show that he or she applied for and was denied a promotion."  *Charles v. Leo*, 96 Mass. App. Ct. 326, 333 (2019); *see also Lopez-Hernandez*, 64 F.4th at 29 (including "qualified for the position **to which he applied**" as an element of a failure-to-promote claim (emphasis added)); *Velez v. Janssen Ortho, LLC*, 467 F.3d 802, 807 (1st Cir. 2006) (noting that failure-to-promote claims require evidence that the plaintiff applied for an open position).

Ms. Givens's failure-to-promote claim fails as a matter of law because she has conceded that she did not apply for the positions.  *See* Givens Dep. Tr. at 194:22–195:4 (testifying that she did not apply for the Primary Care Manager position); *id.* at 207:24–208:2 (testifying that she did not apply for the Contact Center Manager position).  Nor does she point to any evidence that such an application would have been futile as to justify waiving this requirement.  *See Charles*, 96 Mass. App. Ct. at 333.

---

[16] MIT made arguments regarding its lack of discrimination in declining to promote Ms. Givens to at least one additional position, which Ms. Givens appears not to dispute.  *See* Opp. at 8 n.6 (disavowing argument as to the "Referral Operations Supervisor" role).  Thus, Ms. Givens waives any argument that MIT's failure to promote Ms. Givens to that additional position constitutes racial discrimination.  *See Montany v. Univ. of New England*, 858 F.3d 34, 41 (1st Cir. 2017) ("Defendants argue that [plaintiff's] failure to put forth any argument in her opposition to defendants' motion for summary judgment [on a particular claim] constitutes abandonment of any such claim.  Having read plaintiff's opposition, we agree.").

This futility exception requires demonstrating "that applying would have been futile because a 'consistently enforced pattern or practice of discrimination' existed which would have resulted in the plaintiff's 'explicit and certain rejection.'"  *Charles*, 96 Mass. App. Ct. at 333 (quoting *Nguyen v. William Joiner Ctr. for the Study of War & Social Consequences*, 450 Mass. 291, 297, 298 (2007)).  "A plaintiff can prove futility by the employer's 'consistent discriminatory treatment of actual applicants, by the manner in which he publicizes vacancies, his recruitment techniques, his responses to casual or tentative inquiries, and even by the racial or ethnic composition of that part of his work force from which he has discriminatorily excluded members of minority groups.'"  *Id.* (quoting *Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324, 365 (1977)).

Ms. Givens argues that MIT created these two positions in bad faith while she was on FMLA leave and that this timing should be viewed as evidence of discriminatory intent.  Opp. at 9–10.  However, Ms. Givens provides no evidence to support her claim that "the positions had already been promised to Ms. Givens" as opposed to merely referring her.  *See* Givens Dep. Tr. at 69:3–21 (testifying only that her manager had referred her for the promotion).  The only evidence Ms. Givens points to is her deposition testimony that during this time, there was not an online application for these positions.  *See id.* at 195:6–11.  But nothing about this reasonably supports the inference that MIT posted these applications with the intention of excluding Ms. Givens, or any other Black applicant, from applying as part of a pattern of discrimination such that her application would have been futile.  *See Charles*, 96 Mass. App. Ct. at 333 (describing requirements to avoid requirement that plaintiff apply to a position to properly support a failure-to-promote claim); *see also Brown v. Coach Stores, Inc.*, 163 F.3d 706, 710–11 (2d Cir. 1998) ("Moreover, if generally requesting a promotion were sufficient to establish a prima facie

case, employers would be unfairly burdened in their promotion efforts. Rather than simply considering individuals who have specifically applied for a promotion, an employer would additionally have to keep track of all employees who have generally expressed an interest in promotion and consider each of them for any opening for which they are qualified but did not specifically apply."). Ms. Givens makes no attempt to even argue that she would have been rejected from the positions for a discriminatory reason had she applied, nor can she point to any evidence to suggest that MIT had a pattern of withholding promotions for Black employees. *See generally* Opp; *see also* SMF ¶¶ 11, 15 (describing how role of Referral Operations Supervisor went to another candidate, who identifies as Black). In fact, Ms. Givens has specifically *not* argued that MIT created the positions of Primary Care Manager or Contact Center Manager while she was on FMLA leave because of her race. SMF ¶ 80. Ms. Givens's mere speculation that the postings were timed to prevent her from applying does not establish a genuine dispute of fact as to MIT's purported discriminatory intent sufficient to survive summary judgment, particularly where undermined by her own admission that her race was not a factor in the timing of the positions' creation. *See Lattimore v. Polaroid Corp.*, 99 F.3d 456, 467–68 (1st Cir. 1996) ("[S]ubmitting the issue of discriminatory intent to a jury on this record would amount to nothing more than an invitation to speculate.").

Even assuming that Ms. Givens had established a *prima facie* case of discrimination, there is no genuine dispute that MIT's legitimate, non-discriminatory reason for hiring Ms. Soto and Ms. Held—that they were more qualified—was not pretextual. Ms. Givens's reliance on *Figueroa v. Pompeo*, 923 F.3d 1078 (D.C. Cir. 2019), to argue that MIT has failed to put forth a legitimate, non-discriminatory reason for hiring Ms. Soto and Ms. Held is misplaced. *See* Opp. at 13–15. In *Figueroa*, the court explained that an employer may not merely assert that the employment

14

decision was based on qualifications but must instead point to specific reasons to support that conclusion, such as "'seniority, length of service in the same position, personal characteristics, general education, technical training, experience in comparable work or any combination' of such criteria." *Figueroa*, 923 F.3d at 1089 (quoting *Steger v. Gen. Elec. Co.*, 318 F.3d 1066, 1076 (11th Cir. 2003)).  Otherwise, the court explained that plaintiffs would be unable to "disprove a defendant's reasons." *Id.* at 1088.  As the D.C. Circuit explained, "[f]ailing to articulate such a reason properly 'is the legal equivalent of . . . having produced no reason at all.'" *Id.* at 1087 (quoting *Patrick v. Ridge*, 394 F.3d 311, 320 (5th Cir. 2004)).  The court did not, as Ms. Givens appears to argue, suggest that an employer must explicitly spell out its entire litigation strategy—such as how it plans to use each piece of evidence—during discovery.

Here, MIT does more than merely argue that Ms. Soto and Ms. Held are more qualified: MIT points to record evidence as to Ms. Soto's and Ms. Held's experience and education that provided the basis for their appointment to the management positions. *See, e.g.*, Mem. at 11 n.3 ("Ms. Soto had over a decade of prior managerial experience and a master's degree."); *id.* at 11 ("Ms. Held had six years of experience managing a call center for another healthcare institution before she was hired by MIT Health."); *see also* SMF ¶¶ 75–76 (citing Dkt. 32-15 (Resume of Marilee Soto, MIT000402–403)) (providing record support for MIT's position on Ms. Soto's qualifications); SMF ¶ 83 (citing Dkt. 32-1 ¶ 21 (Giddarie Aff.)) (providing record support for MIT's position on Ms. Held's qualifications).  In doing so, MIT properly supports its "specific reasons" for hiring Ms. Soto and Ms. Held over Ms. Givens's as directed by the D.C. Circuit.  *See Figueroa*, 923 F.3d at 1089; *cf. Alexander v. Fulton Cty.*, 207 F.3d 1303, 1342 (11th Cir. 2000) (finding that an employer failed to provide a sufficient reason for promoting a candidate over plaintiff because the evidence "failed to identify any specific qualifications of [the other candidate]

that explained his appointment"), *overruled in part on other grounds by Manders v. Lee*, 338 F.3d 1304 (11th Cir. 2003) (en banc).  Ms. Givens's contention that MIT never previously disclosed Ms. Held's qualifications or its basis for hiring Ms. Soto and Ms. Held does not alter the Court's analysis, especially where MIT did disclose the basis for this argument during discovery and Ms. Givens does not attack the qualifications themselves.  *See, e.g.*, Dkt. 32-15; SMF ¶ 84 (citing Givens Dep. Tr. at 207:20–23 (deposition testimony from Ms. Givens that she does not dispute that Ms. Held is qualified for the position of Contact Center Manager)).

Ms. Givens makes no attempt to explain what the purported basis for pretext is in this case. *See* Opp. at 15; *Rathbun v. Autozone, Inc.*, 361 F.3d 62, 74 (1st Cir. 2004) ("When an employer claims to have hired or promoted one person over another on the basis of qualifications, the question is not which of the aspirants was better qualified, but, rather, whether the employer's stated reasons for selecting one over the other were pretextual.").  In assessing pretext, "[i]t is not enough for a plaintiff merely to impugn the veracity of the employer's justification; [s]he must 'elucidate specific facts which would enable a jury to find that the reason given is not only a sham, but a sham intended to cover up the employer's real motive: [race] discrimination.'"  *Mesnick v. Gen. Elec. Co.*, 950 F.2d 816, 824 (1st Cir. 1991) (quoting *Medina-Munoz*, 896 F.2d at 8), *cert. denied*, 504 U.S. 985 (1992).

In assessing pretext based on qualifications, the First Circuit has emphasized that "courts may not sit as super personnel departments, assessing the merits—or even the rationality—of employer's nondiscriminatory business decisions."  *Mesnick*, 950 F.2d at 825; *see also Feliciano*, 218 F.3d at 8 ("[E]ven if a rational trier of fact could infer from the evidence of pretext that [the defendant's adverse employment action] was 'unfair,' . . . that proof is not sufficient to state a claim under Title VII.").  Here, there is no genuine dispute that Ms. Soto and Ms. Held each are

fully qualified for the positions they were hired to fill, nor is there any dispute that Ms. Soto has both a bachelor's and master's degree.  SMF ¶¶ 75–76 (describing Ms. Soto's qualifications); *id.* ¶ 84 (describing Ms. Held's qualifications).  Ms. Givens concedes that she had previously been informed that a formal college degree and more experience would help her professional development.  CSMF ¶¶ 47–48; *see also Heard v. Com. of Massachusetts*, 2003 WL 21960726, at *6 (D. Mass. Aug. 11, 2003) (explaining that plaintiff's beliefs that her qualifications were superior to those of comparator employee carries little probative weight and is in itself insufficient to satisfy plaintiff's burden under step three of the *McDonnell Douglas* test as to plaintiff's claims of discrimination based on race).  Even if this Court were to credit Ms. Givens's contention that she was more qualified for these roles, it is not the role of the court to second-guess MIT's hiring decisions where there is no evidence to suggest that MIT is using qualifications as a mere pretext to cover up discrimination.  *See Rathbun*, 361 F.3d at 74 ("When an employer claims to have hired or promoted one person over another on the basis of qualifications, the question is not which of the aspirants was better qualified, but, rather, whether the employer's stated reasons for selecting one over the other were pretextual.").  On this point, Ms. Givens merely points to the timing of the (public) job postings.[17]

Given the lack of evidence substantiating such blanket assertions, "submitting the issue of discriminatory intent to a jury on this record would amount to nothing more than an invitation to speculate."  *Lattimore v. Polaroid Corp.*, 99 F.3d 456, 467–68 (1st Cir. 1996).  Ms. Givens has not presented competent evidence of pretext for discriminatory animus to sustain her burden of

---

[17] Again, Ms. Givens explicitly does not contend that the timing had anything to do with her race.  *See supra* at 14.

proof under phase three of *McDonnell Douglas* as to her claim of racial discrimination, and thus her claim fails.

### 2.    Hostile Work Environment

MIT argues that Ms. Givens's claim that she was subjected to a hostile work environment must fail because she only "points to two stray remarks . . . during her twelve years of employment," only one of which "is reasonably characterized as being correlated to race," and further contends these remarks were not so severe or pervasive impact Ms. Givens's employment.[18]  Mem. at 13–16.  Ms. Givens argues that she and other Black employees were subjected to numerous similar statements based on racial tropes "consistently throughout her tenure" and that whether the statements were sufficient to support a claim of hostile work environment is a question for the jury.  Opp. at 4–7.

"A hostile work environment is one that is 'pervaded by harassment or abuse, with the resulting intimidation, humiliation, and stigmatization, [and that] poses a formidable barrier to the full participation of an individual in the workplace.'"  *Cuddyer v. Stop & Shop Supermarket Co.*, 434 Mass. 521, 532 (2001).  A hostile work environment claim requires, among other things, that the conduct was "sufficiently severe or pervasive so as to alter the conditions of plaintiff's employment and create an abusive work environment," and that the "objectionable conduct was

---

[18] MIT argues for the first time in its reply that Ms. Givens's hostile work environment claim must fail because Ms. Givens failed to exhaust administrative remedies.  Reply at 7–8.  While it is true that "Title VII requires exhaustion of administrative remedies as a condition precedent to suit in federal district court," *Jensen v. Frank*, 912 F.2d 517, 520 (1st Cir. 1990), "[w]here, as here, a moving party raises an argument for the first time in a reply, that argument is waived," *Massachusetts ex rel. Powell v. Holmes*, 546 F. Supp. 3d 58, 80 n.9 (D. Mass. 2021); *see also Glob. NAPs, Inc. v. Verizon New England Inc.*, 603 F.3d 71, 85 (1st Cir. 2010) ("Arguments that a party failed to exhaust its administrative remedies are waivable unless an exhaustion requirement is jurisdictional.  And exhaustion requirements are not jurisdictional unless Congress has explicitly designated them as such." (citations omitted)); *Doe v. Town of S. Kingstown by & through Saul*, 762 F. Supp. 3d 166, 174 (D.R.I. 2025) (explaining that Title VII "claim-processing rules become 'mandatory'—meaning courts must enforce the rules—only if a party properly raises an objection based on such rules." (citing *Fort Bend Cnty., Texas v. Davis*, 587 U.S. 541, 549 (2019))), *appeal dismissed*, 2025 WL 2330093 (1st Cir. July 28, 2025).

both objectively and subjectively offensive, such that a reasonable person would find it hostile or abusive and the victim in fact did perceive it to be so." *Ponte v. Steelcase Inc.*, 741 F.3d 310, 320 (1st Cir. 2014) (citation omitted); *see also id.* at 319 n.9 (acknowledging that the same legal standard applies to claims for hostile work environment brought under both federal and state law). Whether a workplace is hostile must be considered based on the totality of the evidence, and while "[t]here is no mathematically precise test," "several factors, none of which are individually determinative, are relevant: the severity of the conduct, its frequency, whether it is physically threatening or not, and whether it interfered with the victim's work performance." *Gerald v. Univ. of P.R.*, 707 F.3d 7, 18 (1st Cir. 2013) (citing *Bhatti v. Trs. of Boston Univ.*, 659 F.3d 64, 73–74 (1st Cir. 2011)).

In order to differentiate between potentially meritorious suits involving severely or pervasively hostile treatment and non-meritorious suits involving ordinary workplace hostility, trial judges are expected to use "common sense, and an appropriate sensitivity to social context." *Ugurhan Akturk Kosereis v. Rhode Island*, 331 F.3d 207, 216 (1st Cir. 2003). The Court is expected to consider all of the circumstances, "including the 'frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.'" *Faragher v. City of Boca Raton*, 524 U.S. 775, 787–88 (1998) (quoting *Harris v. Forklift Sys.*, 510 U.S. 17, 23 (1993)). Thus, although questions regarding the severity or pervasiveness of harassment are ordinarily reserved for the factfinder when a plaintiff's evidence presents even a borderline case, *Marrero v. Goya of P.R., Inc.*, 304 F.3d 7, 19 (1st Cir. 2002), "summary judgment is an appropriate vehicle for 'policing the baseline for hostile environment claims.'" *Pomales v.*

*Celulares Telefonica, Inc.*, 447 F.3d 79, 83 (1st Cir. 2006) (quoting *Mendoza v. Borden, Inc.*, 195 F.3d 1238, 1244 (11th Cir. 1999) (en banc)).

Ms. Givens points to a few specific examples of remarks, some of which she contends are merely illustrative examples of the types of racial remarks she was subjected to during her time at MIT.  Specifically, Ms. Givens claims that (1) Ms. Tetreault called Ms. Givens "rough around the edges" in comparison to white employees;[19] (2) Ms. Johnston made similar comments and referred to her as "uneducated";[20] (3) Ms. Edouard told her and other Black employees that "they do not like your leadership [style]";[21] and (4) Mr. Ellis asked Ms. Givens in early 2023 if she "had heard the saying about 'house n-word and field n-word,'" and then told her to "stay in the light" and "stay out of the fights."[22]  Opp. at 3–5 (alternation in original); Mem. at 13–15.  MIT contends that Ms. Givens's deposition testimony contradicts her answers to interrogatories, seemingly arguing that the Court should thus discredit all allegations other than the Alleged Remark.  Dkt. 40 ("Reply") at 9–10.   However, to the extent that Ms. Givens contradicted her answers to interrogatories during her deposition, that dispute cannot be resolved by the Court on summary judgment.  *See Gomez v. United States*, 2021 WL 38278, at *5 (D. Mass. Jan. 5, 2021) (explaining that inconsistencies between deposition testimony and interrogatory answers are "fodder for

---

[19] The parties dispute whether this statement was made in the context of comparing Ms. Givens to white employees.  *See* SMF ¶ 23; Mem. at 14; Opp. at 5.

[20] MIT notes that Ms. Givens admitted that Ms. Johnston never called or referred to her as "uneducated." Reply at 9 (citing Givens Dep. Tr. at 119:21–120:14).  As discussed above, while Ms. Givens frames the dispute as one over tone, given the evidence cited in her opposition, the Court treats this fact as disputed for purposes of this motion.  *See supra* at 1–2 & note 3.

[21] MIT points to undisputed evidence that complaints were made about Ms. Givens's leadership style and that a PSR who worked with her quit because she felt that the "dynamic" with Ms. Givens was "worsening" and "prohibiting" her growth, CSMF ¶¶ 31–32, such that this comment by Ms. Edouard cannot reasonably sustain a hostile work environment claim, Reply at 10.

[22] Ms. Givens further claims that Ms. Johnston "treated [her] differently than white employees in an effort to create a hostile work environment based upon [her] race."  Opp. at 5.  This conclusory statement is not evidence to credit for summary judgment.  *See Mancini*, 909 F.3d at 38 (quoting *Ahern*, 629 F.3d at 54).

cross-examination," but "do not present a basis for granting summary judgment"); *see also Noonan*, 556 F.3d at 25 ("At summary judgment, the court's task is not to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." (internal quotes omitted)).

Generally, the issue of whether various remarks, like those Ms. Givens has identified, are sufficiently severe, pervasive, and objectively hostile are questions of fact for the jury. *See Conto v. Concord Hosp., Inc.*, 265 F.3d 79, 81 (1st Cir. 2001) (explaining that a hostile work environment claim "necessarily entail[s] a fact-specific assessment of all the attendant circumstances"); *Gorski v. N.H. Dep't of Corr.*, 290 F.3d 466, 474 (1st Cir. 2002) (holding that factfinder should determine the degree of severity or pervasiveness); *Sullivan v. Mass. Bay Commuter R.R. Co., LLC*, 2009 WL 1067184, at *8 (D. Mass. Apr. 22, 2009) ("The question of whether a plaintiff was subjected to an objectively hostile environment should generally be determined by the finder of fact, assess[ing] the matter on a case-by-case basis, weighing the totality of the circumstances." (internal quotations omitted)). However, to sustain a hostile work environment claim, a plaintiff must also show that the conduct at issue "alter[ed] the conditions of plaintiff's employment." *Ponte*, 741 F.3d at 320.

Even if a reasonable jury could conclude that the statements, individually or collectively, were both racial in nature and sufficiently offensive, there is no evidence that such comments had

any impact on Ms. Givens's participation in the workplace.[23]  *See Ponte*, 741 F.3d at 320 (explaining that a necessary element of a hostile work environment claim is that the conduct at issue "alter[s] the conditions of plaintiff's employment and create an abusive work environment"). Ms. Givens received a promotion after the alleged comments by Ms. Tetreault.  SMF ¶¶ 22, 24.  It is also undisputed that Ms. Givens was "always seen as [a] very high producer" and a "workhorse" in a "very positive way."  SMF ¶ 19; CSMF ¶ 19.  The record is devoid of evidence to support Ms. Givens's contention that any of the statements had any impact on her ability to seek promotions that she would have been qualified for, especially where Ms. Givens does not even appear to argue that these statements discouraged her from applying for promotions.[24]  *See Mancini v. City of Providence ex rel. Lombardi*, 909 F.3d 32, 38 (1st Cir. 2018) ("[A] court . . . disregards '[c]onclusory allegations, improbable inferences, acrimonious invective, or rank speculation.'" (quoting *Ahern v. Shinseki*, 629 F.3d 49, 54 (1st Cir. 2010))).

Because the Court finds that there is no issue of material fact as to whether Ms. Givens suffered harassment on the basis of a protected characteristic, or as to whether the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, MIT is entitled to summary judgment as to Ms. Givens's hostile work environment claims.

---

[23] While the Court has concluded that MIT has waived an exhaustion argument with regards to the hostile work environment claim, *see supra* note 18, the fact that Ms. Givens testified at her deposition that she did not raise the Alleged Remark as part of her MCAD complaint certainly undermines her contention that she found the statement offensive enough to impact her work.  *See* Givens Dep. Tr. at 248:14–17 ("[MIT's Counsel]: Did you ever bring a claim at the MCAD complaining about Mr. Ellis asking if you had heard this phrase house N word and field N word [the Alleged Remark]?  [Ms. Givens]: No."); *see also* SMF ¶¶ 124, 126–27 (describing testimony from Ms. Givens in which she admits that she did not understand what Mr. Ellis meant by the Alleged Remark, had never heard the phrase in her life, and had "no idea" of the context of the alleged comment).  Further, Ms. Givens does not actually argue that the statements impacted her work at all.  *See* Opp. at 5 (arguing only that the "racial tropes were repeatedly used . . . to discourage black women, including Ms. Givens, from seeking supervisory positions at MIT").

[24] Despite Ms. Givens's belief that she was qualified for a manager role, the undisputed evidence demonstrates that MIT preferred candidates with a formal college degree.  SMF ¶¶ 44–45, 48, 53.

### 3.    <u>Retaliation</u>

In her amended complaint, Ms. Givens alleges that MIT "fail[ed] to compensate her fairly or appropriately," which she claims was a "willful discriminatory employment practice[]" and an act of retaliation for filing her charge at the Massachusetts Commission Against Discrimination ("MCAD"). Dkt. 11 ("Compl.") ¶¶ 20, 52. MIT argues that this claim fails because not only is there "no basis for Ms. Givens to claim that she was unfairly treated in her level of compensation because of her race," but also because she received increases to her salary even after filing her MCAD complaint. Mem. at 16–17. Ms. Givens does not address this argument in her opposition and thus has waived opposition. *See Montany v. Univ. of New England*, 858 F.3d 34, 41 (1st Cir. 2017) ("Defendants argue that [plaintiff's] failure to put forth any argument in her opposition to defendants' motion for summary judgment [on a particular claim] constitutes abandonment of any such claim. Having read plaintiff's opposition, we agree.").

In any event, the Court finds no support in the record for Ms. Givens's retaliation claim. There is no evidence in the record that MIT took any adverse employment action in response to Ms. Givens's complaints, whether made internally or to MCAD. Ms. Givens cannot show that any of MIT's actions had any relation whatsoever to any protected conduct. *See, e.g.*, *Mole v. Univ. of Mass.*, 442 Mass. 582, 591–92 (2004) (holding that a *prima facie* retaliation claim under Chapter 151B requires a showing that a plaintiff engaged in legally protected conduct, suffered an adverse employment action, and that the two elements were causally connected).

B. **Family and Medical Leave Act**[25]

MIT contends that Ms. Givens was restored to the exact same position after her FMLA leave, and thus MIT did not violate the FMLA.[26]  Mem. at 20–21; Reply at 10–14.  Ms. Givens argues that MIT's creation of a "Manager" position above her "Supervisor" position and the loss of responsibilities upon returning from FMLA leave each constitute a demotion.  Opp. at 16–18.

1. **Interference**

Under the FMLA, an employee "shall be entitled, on return from such leave—(A) to be restored by the employer to the [previous] position . . . or (B) to be restored to an equivalent position with equivalent employment benefits, pay, and other terms and conditions of employment."  *Watkins v. J & S Oil Co.*, 164 F.3d 55, 59 (1st Cir. 1998) (alternation in original) (quoting 29 U.S.C. § 2614(a)(1)(A)–(B)).  This entitlement "does not extend to de minimis, intangible, or unmeasurable aspects of the job."  29 C.F.R. § 825.215(f).  "An equivalent position is one that is virtually identical to the employee's former position in terms of pay, benefits and working conditions, including privileges, perquisites and status.  It must involve the same or substantially similar duties and responsibilities, which must entail substantially equivalent skill, effort, responsibility, and authority."  *Id.* § 825.215(a).

Ms. Givens concedes that her title after her FMLA leave remained Primary Care Supervisor, and that no one ever told her that her title had changed or that she had been demoted.  SMF ¶ 109; *see also* CMSF ¶¶ 71, 110 (disputing only job responsibilities).  There is also no dispute that upon Ms. Givens's return from FMLA leave, her salary and benefits remained the

---

[25] There is no dispute regarding Ms. Givens's eligibility for FMLA leave and the related protections.

[26] While Ms. Givens's amended complaint also suggested that part of her claim of retaliation was based on MIT's failure to pay Ms. Givens for her first day of work, Compl. ¶ 27, Ms. Givens argues only on the basis of her purported demotion in opposing summary judgment, *see* Opp. at 16–21.  Accordingly, any opposition to summary judgment on the failure-to-pay theory of retaliation is waived.  *See Montany*, 858 F.3d at 41.

same as before her leave. SMF ¶¶ 110–11. Instead, Ms. Givens focuses on her "duties and responsibilities," arguing that after she returned from leave, MIT stripped her of all prior "supervisory authority" over the PSRs she had formerly managed, relegated her to a PSR, required her to report to a new employee who "assumed her former role," and removed her "as a direct report of the Director of Nursing." Opp. at 18.

To the extent that Ms. Givens argues that she should have had no responsibility to complete PSR tasks because her title was "Supervisor," *id.* at 16, the relevant question is not what the appropriate responsibilities for her role should have been based on her title but whether Ms. Givens returned to the same or similar position and responsibilities she held prior to taking FMLA leave. *See Hillstrom v. Best W. TLC Hotel*, 265 F. Supp. 2d 117, 127 (D. Mass. 2003) (describing as "de minimis" an employee's change in title to "more accurately describe the job that [the employee] had always performed"), *aff'd on other grounds*, 354 F.3d 27 (1st Cir. 2003). Ms. Givens contends that the role of supervisor "did not require Ms. Givens to undertake *any* [PSR] tasks," Opp. at 16 (emphasis in original) (citing Tetreault Dep. Tr. at 19:17–22:9), but the undisputed evidence demonstrates that Ms. Givens did complete PSR tasks as part of her role as a supervisor before going on FMLA leave, SMF ¶ 69; *see also id.* ¶¶ 65–66 ("In March 2023 . . . Ms. Edouard told Ms. Givens that . . . she wanted Ms. Givens to set up her schedule so that she split her time between Administrative Supervisor Tasks and Primary Care PSR Tasks." (citations omitted)); Dkt. 32-13 at 3 (schedule drafted by Ms. Givens in March 2023 that split her time between PSR tasks in Primary Care and Administrative Supervisor tasks, setting aside half of the week for each); Givens

Dep. Tr. at 175:18–20 ("I was saying to her ever since I have been a lead, I have been doing everyone's titles from supervisor to lead to PSR.").[27]

Finally, Ms. Givens argues that she lost all of her supervisory tasks after returning from FMLA leave, which were instead given to Ms. Soto, and that this constitutes a demotion in violation of the FMLA. Opp. at 17–18 (citing Givens Dep. Tr. at 234:24–235:4[28]). However, neither the argument of counsel nor the scant record evidence Ms. Givens relies upon creates a *genuine* dispute of fact. Despite testifying that she "wasn't doing any supervisor tasks" after her leave, Ms. Givens also testified that one "could say" that her "day-to-day responsibilities didn't change." Givens Dep. Tr. at 233:23–234:4. Ms. Givens's amended complaint alleges, and other record evidence demonstrates, that she maintained supervisory tasks. *See generally* Compl. (asserting FMLA violations due to a "demot[ion] from the Supervisor position that she held prior to her FMLA leave to a '50% Supervisor position, 50% Patient Service Representative Position'" with no allegation that she no longer had any supervisory authority); *see also* Dkt. 36-10 (email from Ms. Givens's manager after the conclusion of the FMLA leave explaining that Ms. Givens's "role [is] Supervisor (50/50 PSR)"). But even assuming Ms. Givens lost some amount of supervisory authority, the Court still concludes that her role remained substantially equivalent, especially in light of Ms. Givens's deposition testimony about the lack of change in her day-to-day

---

[27] Ms. Givens cites to Ms. Tetreault's deposition testimony for the contention that the role of supervisor "did not require Ms. Givens to undertake *any* [PSR] tasks." Opp. at 16 (emphasis in original). However, this testimony merely described the general job description for Ms. Givens's supervisory position, and Ms. Tetreault specifically testified that Ms. Givens still was "taking on the work and doing the work of a [PSR] rather than coaching her staff for them to do the work." Tetreault Dep. Tr. at 22:3–5. Especially given the lack of title change, the relevant inquiry is whether Ms. Givens's responsibilities changed after her FMLA leave.

[28] It is not clear that this testimony even creates a dispute of fact, let alone a genuine one. Ms. Givens does not testify that MIT re-assigned her supervisory tasks, just that they had her complete re-training. Givens Dep. Tr. at 234:24–235:4. Nor does Ms. Givens point to any other evidence in support of this claim. *See* Opp. at 17–18. However, as the Court must draw reasonable inferences in Ms. Givens's favor as the non-movant, *see Noonan*, 556 F.3d at 25, the Court does not turn its decision on this issue.

responsibilities, and the lack of change to her title, benefits, and pay. *See Packard v. Massachusetts*, 2011 WL 4549199, at *8 (D. Mass. Sept. 28, 2011) ("[E]quivalent" work is "that which is substantially equal or similar, not necessarily identical or exactly the same." (quoting *Watkin*, 164 F.3d at 59)); *Hillstrom*, 265 F. Supp. 2d at 126–27 (granting summary judgment whether plaintiff oversaw all employees in his division prior to taking leave and lost supervision of one engineer upon his return). *But see Lafortune v. Fiber Materials, Inc.*, 2004 WL 2378861, at *4 (D. Me. Oct. 25, 2004) (denying summary judgment on FMLA interference claim where plaintiff submitted evidence that his new role "lacked the supervisory responsibilities of the plaintiff's former position and deprived him of a private office").

That Ms. Givens reported to a new manager (Ms. Soto) after her leave does not change the analysis.[29]    Despite Ms. Givens's arguments to the contrary, the record demonstrates that Ms. Soto's role was not the same as Ms. Givens's role.  Ms. Soto managed urgent care in addition to clinical operations and was at a higher level in the organizational structure than a supervisor. Dkt. 36-7 at 49:6–17 (describing differences between Ms. Soto's and Ms. Givens's positions); *cf.*

---

[29] The Court also notes that this argument does not appear in Ms. Givens's amended complaint and thus is arguably improper as a basis on which to oppose summary judgment.  "The purpose of disfavoring new claims on summary judgment is to ensure that defendants have timely and complete notice of the allegations against them so that they can adequately defend themselves." *Avalanche IP, LLC v. FAM, LLC*, 2022 WL 3597411, at *5 (D. Mass. Aug. 23, 2022).  Ms. Givens's amended complaint makes no mention of her current allegations that her demotion stemmed from Ms. Soto's being hired into what was merely a repackaging of Ms. Givens's prior role, and would require evidence separate and apart from that to defend against Ms. Givens's theory that her demotion came from adding PSR tasks to her job description. *See Patel v. City of Long Beach*, 564 F. App'x. 881, 882 (9th Cir. 2014) ("Allowing a plaintiff to proceed on a new theory would prejudice defendants because 'a complaint guides the parties' discovery putting the defendant on notice of the evidence it needs to adduce in order to defend against the plaintiff's allegations.'" (quoting *Coleman v. Quaker Oats Co.*, 232 F.3d 1271, 1292–93 (9th Cir. 2000))).  In the absence of any "essential allegations" that might form the basis of a claim based on Ms. Soto's position, broad construction of the complaint under Fed. R. Civ. P. 8 is unwarranted. *See Diomed Inc. v. Vascular Sys., Inc.*, 417 F. Supp. 2d 137, 141 (D. Mass. 2006) (refusing to consider legal theory based on facts "raised for the first time in [plaintiff's] opposition to defendants' summary judgment motion" and where there were no "essential allegations" to justify broad construction of complaint).  This is especially true where the references to Ms. Soto's position related to Ms. Givens's claim that she was discriminated against when she did not receive a "promotion" to this position (in direct contradiction to the contention that this role is the same as Ms. Givens's prior position).  However, the Court does not turn its decision on this issue, as it recognizes that there could feasibly be overlap in the factual basis for these two theories and MIT does not contend that it is unable to defend against this theory.

*Packard v. Massachusetts*, 2011 WL 4549199, at \*8 (D. Mass. Sept. 28, 2011) (holding that new position was not substantially equivalent where it "involved two new substantive areas" and was classified as a higher-level position); *see also Weston–Smith v. Cooley Dickinson Hosp., Inc.*, 153 F. Supp. 2d 62, 72 (D. Mass. 2001) (where newly created position subsumed many of the employee's responsibilities, but also included significant additional responsibilities, terminated employee did not establish a discriminatory intent in reorganization), *aff'd*, 282 F.3d 60 (1st Cir. 2002); *Berry v. City of S. Portland, Me.*, 525 F. Supp. 2d 214, 229 (D. Me. 2007) (explaining in the Title VII context that "[w]hen a general reorganization results in some reduction in job responsibilities without an accompanying decrease in salary, or grade, those changes cannot be dubbed adverse employment actions." (alteration in original) (quoting *Gu v. Boston Police Dep't*, 312 F.3d 6, 14 (1st Cir. 2002))).

On the record before the Court, no reasonable jury could conclude that Ms. Givens's position after her FMLA leave was not the same or substantially equivalent. Therefore, Ms. Givens's FMLA interference claim must fail.

### 2.    Retaliation

The FMLA also protects employees against retaliation "based on their employers' 'use [of] the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions.'" *Germanowski v. Harris*, 854 F.3d 68, 72 (1st Cir. 2017) (quoting 29 C.F.R. § 825.220(c)). A *prima facie* case of retaliation under the FMLA requires a plaintiff to demonstrate "that (1) [s]he availed himself of a protected right under the FMLA; (2) [s]he was adversely affected by an employment decision; [and] (3) there is a causal connection between the employee's protected activity and the employer's adverse employment action." *Chase v. U.S. Postal Serv.*, 843 F.3d 553, 558 (1st Cir. 2016) (quoting *Hodgens v. Gen. Dynamics Corp.*, 144 F.3d 151, 164 (1st Cir. 1998)). "In an FMLA retaliation case, the employer's intent—*i.e.*, why the

employer fired or acted against the employee—matters." *Carrero-Ojeda v. Autoridad de Energía Eléctrica*, 755 F.3d 711, 719 (1st Cir. 2014).

Ms. Givens's retaliation claim fails for the same reasons as her interference claim.[30]  *See Stratton*, 113 F.4th at 46 (recognizing "that, in some cases, interference and retaliation claims will overlap").  Because Ms. Givens was returned to the same or substantially same position as she held before her leave, as a matter of law, Ms. Givens cannot establish that she suffered an adverse employment action.[31]

To the extent that Ms. Givens contends that there were changes to her job sufficient to constitute constructive discharge, such arguments also fail.[32]  As another session of this District explained:

> A constructive discharge occurs only where an employee's working conditions are "so onerous, abusive, or unpleasant that a reasonable person in [her] position would have felt compelled to resign." *E.E.O.C. v. Kohl's Dept. Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014) (additional quotations and citations omitted) (alteration in original).  Those conditions "must have been so intolerable . . . that her only option was to quit." *Id.* (additional citation omitted).  This standard "is entirely objective" and "do[es] not put weight on the employee's subjective beliefs, no matter how sincerely held." *Id.* (additional quotations and citations omitted).

---

[30] MIT also argues that there is no evidence that MIT reprimanded Ms. Givens whatsoever, let alone evidence sufficient to support her claim of FMLA retaliation.  Mem. at 20.  Ms. Givens does not respond to this argument and thus waives opposition. *See Montany*, 858 F.3d at 41.  Regardless, Ms. Givens's deposition testimony unequivocally undermines her allegation. *See* Givens Dep. Tr. at 239:11–22.

[31] Further, in the Title VII context, the First Circuit has made clear that only a dramatic decrease in supervisory authority will constitute an adverse employment action. *See Gu*, 312 F.3d at 14 (finding that the loss of some supervisory authority as a result of a restructuring is insufficient for an adverse employment action).

[32] Both parties appear to argue constructive discharge only as part of Ms. Givens's FMLA retaliation claim. *See* Mem. at 19–20 (discussing constructive discharge as a subheading under the heading "The Court Should Grant Summary Judgment in Favor of MIT on Ms. Givens's Claims under the FMLA"); Opp. at 21 (discussing constructive discharge in the context of retaliation under the heading "Ms. Givens Has Met Her Burden On her FMLA Claim").  While constructive discharge can also form the basis of a claim under Chapter 151B and Title VII, *see Luciano v. Coca-Cola Enters., Inc.*, 307 F. Supp. 2d 308, 320 (D. Mass. 2004), because neither party argues that constructive discharge has any bearing on the other claims, the Court treats it as applying only to the FMLA retaliation claim.

*Gregg v. Ne. Univ.*, 743 F. Supp. 3d 257, 279 (D. Mass. 2024).   Another court described constructive discharge as requiring "a showing of harassment that is more severe than is required for a hostile work environment claim." *Sauer v. Belfor USA Grp., Inc.*, 205 F. Supp. 3d 209, 219 (D. Mass. 2016) (quoting *Luciano v. Coca-Cola Enters., Inc.*, 307 F. Supp. 2d 308, 320 (D. Mass. 2004)).   As the First Circuit has explained, "[a] reduction in responsibility . . . unaccompanied by diminution of salary or some other marked lessening of the quality of working conditions" does not constitute constructive discharge. *Suarez v. Pueblo Int'l, Inc.*, 229 F.3d 49, 55 (1st Cir. 2000). Thus, "evidence of a single unfavorable performance review or even of a demotion generally will not be deemed sufficient to support a claim." *GTE Prods. Corp. v. Stewart*, 421 Mass. 22, 34 (1995).

On the record before the Court, no reasonable jury could find that Ms. Givens's working conditions were so intolerable that she could not continue working while attempting to resolve the dispute. *See* Givens Dep. Tr. at 233:23–234:4 (acknowledging that, after her return from FMLA leave, one "could say" that her "day-to-day responsibilities didn't change"); SMF ¶ 110 ("After Ms. Givens returned to work after FMLA leave, her salary did not change."); *id.* ¶ 111 ("The benefits provided or made available to Ms. Givens before her FMLA leave remained the same after her return from leave."); *cf. Marrero v. Goya of P.R. Inc.*, 304 F.3d 7, 28–29 (1st Cir. 2002) (holding that there was enough evidence for a jury to find constructive discharge where the plaintiff suffered a long history of hostility, and after repeated complaints her transfer did nothing to ameliorate her condition and in fact worsened the harassment she suffered).   "By [Ms. Givens's] own account, she was performing successfully." *Luciano*, 307 F. Supp. 2d at 321; *see also Stratton*, 113 F.4th at 41 (affirming grant of summary judgment on Title VII constructive discharge

claim where plaintiff "herself insists that—despite these supposedly intolerable work conditions—she was able to perform her job adequately throughout her tenure").[33]

## IV.    <u>Conclusion</u>

For the foregoing reasons, MIT's motion for summary judgment is GRANTED.

**So Ordered.**

/s/ Brian E. Murphy
Brian E. Murphy
Judge, United States District Court

Dated:  September 15, 2025

---

[33] That Ms. Givens failed to respond to MIT's attempts to address her complaints further undermines her constructive discharge claim. *See* Reply at 14; Dkt. 41-2 at 2–3; *see also Equal Emp. Opportunity Comm'n v. Kohl's Dep't Stores, Inc.*, 774 F.3d 127, 134 (1st Cir. 2014) (rejecting Title VII constructive discharge theory because the plaintiff "actively disregarded" opportunities to resolve her job-related complaints by, for example, refusing her employer's "offer[] to discuss other work arrangements").